Katie Marchant, OSB No. 161147
333 SW Taylor St., Ste. 300
Portland, OR 97204
Phone: (615) 585-7603
Email: katie@marchantlawllc.com
Attorney for Raymond Allen Stavig

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>Raymond Allen Stavig,<br><br>Defendant. | Case No. 3:24-cr-00414-IM<br><br>**Defendant's Sentencing Memorandum** |

## I. Introduction

Ray Stavig is the first to admit that when federal agents arrested him on October 18, 2024, the government would have been justified in sending him straight to prison. By his own account, he was still struggling to shed the life his criminal history reflects: addicted to methamphetamine and entangled with the people and habits that kept him cycling in and out of custody. But instead of jail, the Court released Mr. Stavig. In the two years that followed, Mr. Stavig did something recidivism data says almost never happens: he rebuilt his life from scratch—and he did it on his own initiative.

Mr. Stavig entered and completed drug treatment, even though no release condition required it. He has remained sober from methamphetamine, the drug that fueled his entire

criminal history, since October 17, 2024. He attends trauma therapy every other week to address the physical and sexual abuse he endured as a child and to build pro-social ways of coping with stress and setbacks. He moved out of the community where the offense occurred and cut off the friends and associates who enabled his drug use and encouraged a criminal mindset. He married Jennifer Hemenway (née Coffelt), an accountant with no criminal history, became a father to his stepdaughter, Izzy, and rebuilt his relationship with his adoptive parents.

Mr. Stavig manages and co-owns a successful chimney repair business. He is a pillar of the youth sports community, officiating baseball and softball, and expanding into other sports. The baseball league's director, aware of Mr. Stavig's criminal history, wrote of Mr. Stavig: "His interaction with the kids is priceless. The joy on their faces when they see him coming to the field is not to go unnoticed. He is special and we are so thankful that we gave him the chance to work with us." Ex. 2(n). Mr. Stavig is also building the Oregon Reentry Program, a nonprofit to support people coming home from state prison. Although it is still in its early stages, Mr. Stavig is taking concrete steps to get it off the ground. These efforts are a testament to Mr. Stavig's rehabilitation efforts. He is not just working to keep himself out of prison. He is working to help others do the same, and, in the process, making his community a better and safer place.

In light of these efforts, the question before the Court is not whether Mr. Stavig committed a serious offense. He did, and he accepted responsibility for it. Instead, the question is what a prison sentence would accomplish that an onerous probationary term would not. It is the defense position that incarceration would improperly elevate punishment above all other sentencing objectives. And it would telegraph to the community that rehabilitative efforts, no matter how remarkable, can never eclipse one's past.

Mr. Stavig asks the Court to impose a sentence of five years' probation, the maximum term authorized by law. At first blush, that may seem like an extraordinary request. Mr. Stavig has a significant criminal history, and he pleaded guilty to a serious crime. But his time on pretrial release has been extraordinary. A prison sentence would undo those achievements at great cost to Mr. Stavig, his family, his community, and the taxpayer.

## II. Case History

On October 18, 2024, federal agents arrested Mr. Stavig on a charge of being a felon in possession of a firearm. On October 22, the Court ordered him released on conditions, including that he reside at the Northwest Regional Re-Entry Center. PSR ¶ 13. On January 9, 2025, Pretrial Services permitted him to move in with his then-girlfriend (now wife) Jennifer Hemenway and her now-16-year-old daughter Isabel. *Id.* ¶ 15. The three have lived together ever since.

On November 5, 2024, a grand jury indicted Mr. Stavig on one count of Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1), to which he pleaded guilty on December 10, 2025. *Id.* ¶ 1. Under the terms of the plea agreement, the parties stipulated to a total offense level of 15. *Id.* ¶ 5. The defense reserved the right to seek "any additional downward departures, adjustments, or variances[.]" *Id.* ¶ 9.

On May 4, 2026, the Probation Office disclosed its draft presentence report. The parties did not object. On August 27, Probation disclosed its final report. The PSR calculated a guideline range of 37 to 46 months, based on a Criminal History Category of V. PSR ¶ ¶ 64, 89.[1] Probation recommended a sentence of 33 months, which reflects the one-level variance contemplated by

[1] The recommendation summary on the first page of the PSR lists a criminal history category of VI and a corresponding range of 41 to 51 months. This appears to be a scrivener's error. It is inconsistent with the report's criminal history scoring in Part B (11 points, Category V) and its guideline computation in Part D. PSR ¶ ¶ 64, 89. The defense relies on the calculation in the body of the report, not the cover page.

the plea agreement. *Id.* ¶ 107. The final PSR also included, as an addendum, an allegation of "other criminal conduct." *Id.* ¶ ¶ 17a, 65. Specifically, the PSR stated that Mr. Stavig's May 20, 2026, accident amounted to a "hit-and-run" while "under the influence of intoxicants[.]" *Id.* The PSR cited to a urinalysis sample that tested positive for alcohol, of which the defense was previously unaware.[2] At the defense's request, the Court reset the sentencing hearing for October 14, 2026.

## III. Objection to Paragraphs 17a and 65: The Record Does Not Reliably Establish That Mr. Stavig Drove Under the Influence of Alcohol

Mr. Stavig objects to paragraphs 17a and 65 of the PSR, which assert that he was driving under the influence of alcohol when he crashed his truck on May 20, 2026. PSR ¶ ¶ 17a, 65. Because the allegation was added in the final report, after the deadline for objections to the draft, the defense asks the Court to find good cause to consider this objection now. *See* Fed. R. Crim. P. 32(i)(1)(D), (3)(B). The defense objects to the characterization of the crash as criminal conduct. The PSR's evidence of intoxication is not sufficiently reliable to pass constitutional muster. *See* USSG § 6A1.3(a) (requiring that information relied on at sentencing have "sufficient indicia of reliability to support its probable accuracy"); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948) (stating that it is "a requirement of fair play that a criminal sentence [is] not predicated on misinformation"); *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995) ("Because this court has held that "a defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information," however, we require that "some minimal indicia of reliability accompany a hearsay statement.") (internal quotation omitted). Moreover, Mr. Stavig's response

[2] Probation produced the toxicology report to the defense on August 31, 2026. The same day, Probation advised the defense that additional information would be forthcoming; however, the defense has not received anything further. Probation did not produce the Sandy Police Department records referenced in paragraph 65 of the presentence report nor has the defense received or seen the "surveillance footage" mentioned.

to the allegation and his behavior since then further prove that probation, not prison, is the appropriate sentence.

As to the PSR's evidence of intoxication, the report states that "there was a positive urinalysis test[,]" but omits that there was also a negative one. By way of background, Mr. Stavig provided a urine sample to his pretrial release officer around noon on May 20 ("federal sample"). Ex. 8. Mr. Stavig provided a second urine sample to his state probation officer about two hours later ("state sample"). *Id.* The federal sample tested positive for alcohol at the 0.02 g/dL cutoff level. *Id.* The report did not provide a quantity, so there is no information as to how far above the cutoff level the sample was. Ex. 9. The state sample found no ethanol at a cutoff level of 0.04 g/dL. Ex. 8. The state sample was also tested for the presence of 15 different controlled substances, including methamphetamine, all of which came back negative. *Id.*

Urinalysis tests such as these cannot be, and are not, used to determine whether someone is or was previously intoxicated. The test results cannot reliably be converted into a blood alcohol concentration at the time of the test.[3] And, unlike blood tests or breathalyzers, retrograde extrapolations cannot be performed on them.[4] Urine alcohol results are simply an inapplicable tool for determining how much, and when, someone consumed alcohol. Furthermore, alcohol from beer, wine, or liquor is chemically identical to alcohol from any other household product that contains alcohol, such as mouthwash, cold medicine, vanilla extract, fermented foods,

---

[3] C.L. Winek et al., *The Unreliability of Using a Urine Ethanol Concentration to Predict a Blood Ethanol Concentration*, 25 Forensic Sci. Int'l 277 (1984), *available at* https://pubmed.ncbi.nlm.nih.gov/6479773/.

[4] Because urine accumulates in the bladder over an unknown period of time, its alcohol concentration reflects an average across the hours since the last time the person urinated. It also varies with hydration and bears no fixed relationship to blood alcohol. For these reasons, the American Academy of Forensic Sciences Standards Board, which governs national forensic toxicology standards, directs that "[r]etrograde extrapolation shall not be performed based on urine alcohol results." *See ANSI/ASB Best Practice Recommendation 122,* Best Practice Recommendation for Performing Alcohol Calculations in Forensic Toxicology §§ 4.3.2, 5.1.3 (1st ed. 2024), *available at* www.aafs.org/academy-standards-board.

aftershave—or even topically applied hand sanitizer. Ex. 9.[5] It is for this reason that supervision agencies commonly warn individuals subject to alcohol monitoring against consuming such products.[6] The Substance Abuse and Mental Health Services Administration (SAMHSA) similarly cautions that a single biomarker result "should not be used as the sole screening tool" and that determining whether someone was intoxicated requires an assessment of the totality of the circumstances.[7]

The surrounding circumstances here corroborate the unreliability of the federal sample. First, the lab did not receive the sample until six days after collection, and there is no evidence as to how the sample was stored or preserved in the interim. Ex. 8 at 1. This is important because if there is sugar or bacteria in the urine, alcohol can form when the sample is not properly refrigerated or preservatives are not added, resulting in a false positive.[8] Second, the federal sample's own validity indicators (creatinine, specific gravity, pH, and oxidizing agents) were all normal. Ex. 8 at 1. This shows that Mr. Stavig made no attempt to conceal a potential positive result, as people who believe they were impaired often do (for example, by drinking large amounts of water before a test). Ex. 9.

---

[5] *See* S.S. Ali et al., *Common Hand Sanitizer May Distort Readings of Breathalyzer Tests in the Absence of Acute Intoxication*, 20 Acad. Emerg. Med. 212 (2013); *The Dangers of the False Positive: Why State Legislatures Should Regulate the Use of EtG Testing in Probation*, North Carolina Journal of Law and Technology, *available at* https://journals.law.unc.edu/ncjolt/blogs/the-dangers-of-the-false-positive-why-state-legislatures-should-regulate-the-use-of-etg-testing-in-probation/.

[6] *See id.* (so stating).

[7] *The Role of Biomarkers in the Treatment of Alcohol Use Disorder*, SAMHSA Advisory, Spring 2012, Vol. 2, Issue 11 at 5, available at https://www.niaaa.nih.gov/sites/default/files/SAMHSA-Advisory-Role-of-Biomarkers-in-the-Treatment-of-Alcohol-Use-Disorder-2012.pdf

[8] A. Helander, I. Olsson & H. Dahl, *Post Collection Synthesis of Ethyl Glucuronide by Bacteria in Urine May Cause False Identification of Alcohol Consumption*, 53 Clin. Chem. 1855 (2007), available at https://pubmed.ncbi.nlm.nih.gov/17717128/ ; J.J. Saady, A. Poklis & H.P. Dalton, *Production of Urinary Ethanol After Sample Collection*, 38 J. Forensic Sci. 1467 (1993), available at https://pubmed.ncbi.nlm.nih.gov/8263488/

Third, there is reliable evidence that the crash may have been due to a seizure, the symptoms of which can appear as intoxication. Ex. 5 at 2. Although the defense has not seen the surveillance footage referenced in the PSR, if a seizure occurs while someone is driving, it could also appear as though that person is driving while intoxicated. *Id*. In other words, the surveillance footage could be consistent with both a seizure and intoxication.

Mr. Stavig has a history of seizures and takes anti-seizure medication. *Id.;* Ex. 4. Breakthrough seizures can occur for a wide variety of reasons, including the failure to take the medication on schedule, as reported here. Ex. 5 at 2. Mr. Stavig went to the emergency room the day of the accident, where he was diagnosed with "seizure-like activity" and prescribed a second anti-seizure medication (Keppra). PSR ¶ 77; Ex. 4 at 8. In a follow-up appointment with his treating physician, the doctor noted that she believed a missed dose caused the seizure and referred Mr. Stavig to a neurologist for an MRI and EEG. *Id.* at 9-13. The neurology appointment is scheduled for November 18, 2026.

Fourth, Mr. Stavig has no history of alcohol abuse. His history includes no alcohol-related offenses. Although alcohol use disorders often co-occur with stimulant addiction, as the Court noted on May 21, there is no evidence this is the case with Mr. Stavig. Mr. Stavig used methamphetamine daily for much of his adult life. PSR ¶ 83. Had he also struggled with alcohol, evidence of it would surely have surfaced long ago. Mr. Stavig's business partner, James Stephens, who has known Mr. Stavig for more than 20 years, reported that Mr. Stavig "does not enjoy alcohol." Ex. 2(m). Mr. Stephens made this comment to a defense investigator on October 18, 2024, long before the allegations at issue here. Throughout his release Mr. Stavig has been subject to random drug and alcohol screening, and apart from the disputed results addressed here, every test has come back clean. PSR ¶ 17.

Fifth, and finally, law enforcement's response to the May 20 crash is consistent with a determination that it was not criminal. The Sandy Police Department did not cite or arrest Mr. Stavig, and it did not refer the accident to the Clackamas County District Attorney's Office.[9] The Clackamas County Probation Office did not pursue a probation violation, even after receiving the positive result. Ex. 2(a). Likewise, after the results of the federal sample came back, Pretrial Services did not pursue a violation and continued to approve Mr. Stavig's requests to travel out of state. Pretrial Services even approved Mr. Stavig's request to travel to Las Vegas to officiate a national youth baseball tournament on October 29, subject to the outcome of the sentencing proceeding. Such approvals are inconsistent with credible concerns that Mr. Stavig is at risk of staying out late and drinking. In sum, the May 20 accident was reviewed by a variety of agencies and never resulted in any criminal charges or release violations. To treat it as criminal conduct here would unduly credit a test that was never designed to be used as evidence of intoxication—and to ignore the significant circumstantial evidence undermining the test's reliability.

When his pretrial release officer accused Mr. Stavig of drunk driving, it cast a pall over his otherwise spotless pretrial record. *See generally* Daniel Kahneman, *Thinking, Fast and Slow* (2011) (discussing negativity bias, where a single negative event heavily overrides a pattern of positive context). At the status conference, the Court wondered about his ongoing commitment to sobriety, and the government hoped that it did not portend a regression to old habits. Mr. Stavig is acutely aware that, to outsiders, his history is not a closed chapter, and any misstep may be construed as a continuation of old patterns. *See* Donald A. Dripps, *Fundamental*

[9] Paragraph 65 of the PSR states, "The crash was not reported to law enforcement." However, it is the defense's understanding that Sandy Police Department found Mr. Stavig's vehicle parked in the Fred Meyer parking lot. And on May 20 (before any urine test came back), Mr. Stavig's pretrial release officer informed the Sandy Police that he believed that the damaged vehicle was caused by Mr. Stavig drunk driving.

*Retribution Error: Criminal Justice and the Social Psychology of Blame*, 56 Vand. L. Rev. 1383, 1396 (2003) (describing the "fundamental attribution error" as the tendency to attribute conduct and its consequences to character rather than circumstances). Mr. Stavig understands that trust is built slowly, and his response to the accusation is proof of his unwavering commitment to his rehabilitation. Mr. Stavig fully cooperated with his release officers, submitted two urine samples, and appeared in court the following day. Instead of requesting an evidentiary hearing, Mr. Stavig agreed to an alcohol prohibition and additional monitoring. Every single test has come back negative. Furthermore, Mr. Stavig went to the hospital, followed up with his doctors, and kept officiating, working, and attending therapy. The incident, if anything, shows just how far he has come.

## IV. Under 18 U.S.C. § 3553(a), post-offense conduct can justify a variance to probation

In *Pepper v. United States*, the Supreme Court confirmed that post-offense rehabilitation is a relevant mitigating circumstance that can support a substantial downward variance. 562 U.S. 476, 490–93 (2011). Although *Pepper* involved a resentencing after a vacated sentence, its reasoning applies with at least equal force to Mr. Stavig's first and only sentencing. As the Court in *Pepper* explained, evidence of rehabilitation "may be highly relevant to several of the § 3553(a)[.]" *Id.* at 491. It is "plainly relevant" to the defendant's history and characteristics. *Id.* at 492. It also "sheds light on the likelihood that [the defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." *Id.*; *accord Gall v. United States*, 552 U.S. 38, 59 (2007) (Gall's "self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts") (internal quotation marks omitted). Indeed, a defendant's "exemplary" post-offense conduct

"may be taken as the most accurate indicator of his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Pepper*, 562 U.S. at 492 (citation omitted).

The Supreme Court has upheld probationary sentences for defendants whose guidelines called for years in prison based on post-offense rehabilitation. In *Gall*, for example, the Court affirmed a sentence of probation where the Guidelines range was 30 to 37 months, emphasizing that, after his offense, Gall had stopped using drugs, finished his education, and started a successful business. 552 U.S. at 41–43, 59. The Ninth Circuit has done the same. *See United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam) (affirming probation and community service where the range was 41 to 51 months); *United States v. Ruff*, 535 F.3d 999, 1002–05 (9th Cir. 2008) (affirming a sentence of one day in custody followed by supervised release where the range was 30 to 37 months).

**A. Mr. Stavig's post-offense rehabilitation**

Mr. Stavig's rehabilitation over the past two years has been nothing short of extraordinary. People with Mr. Stavig's criminal history recidivate at high rates, and most who do so are rearrested within the first two years.[10] Yet Mr. Stavig defied the odds, and by every measure he will continue to do so. This is because he built a life with the well-established hallmarks of successful reintegration: stable employment, strong family and community ties, sustained sobriety and mental health treatment, and distance from the neighborhood and associates of his past.

1. Sustained sobriety and mental health treatment

---

[10] *See* The Marshall Project, *Seven Things to Know About Repeat Offenders* (Mar. 9, 2016), https://www.themarshallproject.org/2016/03/09/seven-things-to-know-about-repeat-offenders (discussing the Sentencing Commission's data with hyperlinks).

Within one month of his arrest, Mr. Stavig asked to be connected with treatment. Exs. 2(i) and 3. No one required him to do so. PSR ¶ 14. On November 18, 2024, he began at the 2.1 Intensive Outpatient level of care, stepped down to the 1.0 Outpatient level, "consistently provided negative U/A results," and completed a relapse-prevention plan. Ex. 3. On March 28, 2025, he graduated, which, under the program's criteria, required completing 100 percent of his treatment plan goals. *Id.*; PSR ¶ 14.

Since then, he has provided clean drug screens to both his state and federal supervising officers. PSR ¶ 17; Ex. 2(a). On October 17, 2026, he will have achieved two full years of sobriety from the drug that defined his adult life and drove the entirety of his criminal history. PSR ¶ 83. As Ms. Prince, a certified alcohol and drug counselor, explained, two years is "a monumental milestone that demonstrates extraordinary neuroplasticity, self-discipline, resilience, and a genuine desire for change." Ex. 2(i).

Mr. Stavig also enrolled in mental health treatment on his own initiative. In January 2026, a comprehensive clinical assessment diagnosed him with post-traumatic stress disorder. PSR ¶ ¶ 16, 78. Since then, he has engaged in individualized, trauma-focused outpatient therapy every other week. *Id.*; Ex. 2(d). Mr. Stavig's therapist reports that he is punctual for appointments and calls ahead when circumstances prevent him from attending. But what stands out most is "Ray's desire to use his life experiences to help others—both children who need dependable adult role models and adults seeking to rebuild their lives." *Id.*

Through therapy, Mr. Stavig is learning to recognize his triggers—bad news, setbacks, uncertainty—and respond to them differently. As his adoptive mother observed, Mr. Stavig used to be "very angry at the world because of how his life had gone." Ex. 2(e). That anger has dissipated. "Now, I see a content man. Now, he can get bumped and get over it. Before he would

just give up. Now, he knows how to handle it." *Id.* These are precisely the internal resources that research on reentry identifies as essential to desistance from crime.[11]

2. Stable employment

In 2023, Mr. Stavig and his longtime friend James Stephens formed Dr. Chimney, LLC, a chimney and gas-insert cleaning, repair, and installation business. Ex. 2(l). When Mr. Stavig was arrested in this case, Mr. Stephens told a defense investigator that, while the company was in its early stages, he hoped "the success of their business will drag Stavig out of the street life," which he believed Mr. Stavig was "starting to see[.]" Ex. 2(m). Mr. Stephens was right. Today, the business provides both men, and an employee, with steady incomes. According to Mr. Stavig's wife, Mr. Stavig "carries a substantial portion of our family's financial responsibilities. His absence would not only leave an emotional void in our home but would create significant challenges for our family financially and in our everyday lives." Ex. 2(f).

Beyond financial stability, the business has given Mr. Stavig a sense of purpose and self-worth. As his adoptive mother observed, in his prior life, Mr. Stavig frequently gave up when things got tough, resorting to old habits and quick money. Ex. 2(e). "But when he followed through and then stuck with it [Dr. Chimney], when that happened, I knew this was a different child. I waited to see what he would do but [he] never quit. It got tough, but he never quit." *Id.* Mr. Stavig's partner corroborates his dedication to the business, describing him as an "integral part" of its success and someone who is "dependable, shows up on time and works hard." Ex. 2(l).

3. Family ties

---

[11] *See* Shadd Maruna, *Making Good: How Ex-Convicts Reform and Rebuild Their Lives* (2001).

Mr. Stavig has built strong family ties. On Thanksgiving Day in 2025, he married Jen Hemenway and his adoptive father officiated. According to Mr. Stavig's adoptive mother, Jen "helped set him straight. She would not put up with his bad behavior and told him to lose his old friends." Ex. 2(e). He did. The couple moved out of Gresham, where the offense occurred, to Sandy, and Mr. Stavig no longer associates with his old friends.[12] As Jen put it, "One of the things I value most about Ray is his commitment to our family. He is present for the everyday things that may seem small but mean so much." Ex. 2(f).

Mr. Stavig is also a stepfather to Jen's now-16-year-old daughter Izzy. Ex. 2(h) (Izzy letter.) ("To me, he is not simply my stepfather—he is my dad, and his presence in my life has made a lasting difference."). Through each other they found their love of sports: Izzy as a softball player and Mr. Stavig as an umpire. Mr. Stavig encouraged Izzy to try out for softball, spending countless hours practicing with her until she made the team. And through Izzy, Mr. Stavig found his calling officiating and coaching youth sports.

Mr. Stavig also reconnected with his adoptive family, including his adoptive parents Jackie and Bruce Hemenway, as well as their extended family. His adoptive sister, Michelle Whiting, wrote that the family is "so proud of his sobriety and the committed, honest, thoughtful, loving man he has become." Ex. 2(o). His adoptive mother echoed the sentiment: "I know he is a late bloomer, but as a family we are very proud of him. The man he is now is the man we knew (and prayed) he could be. I can't tell you how excited we are about his life right now." Ex. 2(e).

[12] Paragraph 72 of the PSR states that Mr. Stavig de-affiliated from his former gang in 2019, "however, he still interacts with others affiliated with the gang." This is not accurate. Mr. Stavig interacts with two prior members – people who also de-affiliated. These individuals are active in the recovery world and serving as peer mentors. Like Mr. Stavig, they have transformed their lives and cut ties with their former associates. Mr. Stavig does not interact with anyone who is a current gang member or who is currently affiliated with any gang. In her letter of support, Mr. Stavig's state probation officer wrote, "Stavig does not associate with those he used to and has surrounded himself with community members who appear to be living a pro-social lifestyle." Ex. 2(a).

Jen observed the same: “Watching him develop those relationships and discovering how meaningful family can be has been one of the most positive changes I have seen in him.” Ex. 2(f).

4. Youth sports

Mr. Stavig learned to umpire baseball while he was in prison. When Izzy’s softball team needed a coach, he volunteered. When the league needed an umpire, he stepped up. As it turned out, he found his passion. Mr. Stavig played football early in high school but did not stick with it. He regrets that decision and believes that the structure of a sports team would have helped him avoid the poor choices he made. So now, he embraces the opportunity to encourage the kids in his community to join a sports team and stick with it. He works hard to create a supportive and positive experience for the players.

By all accounts he has succeeded. Rob Weir, the director of West Coast Premiere Baseball, a youth baseball league, observed that “[Mr. Stavig’s] interaction with the kids is priceless. The joy on their faces when they see him coming to the field is not to go unnoticed. He is special and we are so thankful that we gave him the chance to work with us.” Ex. 2(n). Alisha Dwyer, a parent whose children have played in games that Mr. Stavig umpired and for teams he coached, voiced a similar opinion: “One of the things that stands out most to me about Ray is the impact he has on kids. He genuinely engages with them and encourages them to grow their skills, confidence, and love for sports.” Ex. 2(b).

Both Mr. Weir and Ms. Dwyer are aware of Mr. Stavig’s record. In his letter, Mr. Weir explained that after speaking with Mr. Stavig about the results of his criminal background check, the organization “decided to give him a chance since there were no crimes against children or

any violence in his background." Ex. 2(n). According to Mr. Weir, the league did not regret its decision:

> Ray has [become] one of our most reliable and dependable umpires within our organization. He is very dedicated to working with the youth within our communities and goes above and beyond on the field and off the field. He has completed training in teamwork classes that we provide, as well as de-escalation classes. He's very knowledgeable of the rules and he is one of our most requested umpires.

*Id.*

To call Mr. Stavig's dedication to youth sports a hobby is an understatement. In the past year alone, he officiated more than 250 games for West Coast Premiere. As a testament to his skill and commitment, Mr. Stavig was one of six umpires selected to officiate the organization's tournament in Arizona this past March. He was also selected to officiate at its national tournament in Las Vegas, which starts October 29, 2026. As noted above, Pretrial Services approved the travel, pending the outcome of Mr. Stavig's sentencing.

In addition to West Coast Premiere, Mr. Stavig umpires for other youth baseball and softball leagues, including Softball USA and Gresham-Barlow Youth Baseball & Softball. The league's Umpire Coordinator calls him "one of the most dependable and community-minded individuals we have," and adds that "[h]e shows up prepared, professional, and with a positive attitude that benefits players, coaches and fellow officials alike. His ability to remain fair, composed, and encouraging makes a meaningful impact on the experience of everyone involved." Ex. 2(j).

Although Mr. Stavig is paid for his time officiating, he also volunteers for the sports leagues. He officiates charity tournaments, such as Home Field Foundation's "Play for Kai" and

"Strikeout Cancer" at Canby High School. Ex. 1 He trains middle and high schoolers to be umpires and helps his teams organize fundraisers to offset league costs. *Id.*

Beyond umpiring, Mr. Stavig coaches third- and fourth-grade basketball. *Id.* He was asked to do so by parents of children whose games he had officiated. He also started refereeing youth basketball, and, this fall, he started training as a high school football referee. *Id.* Each of these organizations runs criminal background checks. It is remarkable that each organization decided that, despite his criminal history, Mr. Stavig could be trusted to show up to games and work with children, parents and coaches.

Mr. Stavig's dedication to youth sports not only allowed him to develop strong community ties—an important factor that forecasts a successful rehabilitation—it also helped him develop the interpersonal skills needed to succeed off the field. Officiating requires making split-second decisions under pressure and remaining composed while parents and coaches scream that it was the wrong call. It is not uncommon for officials to face significant vitriol during games, even those played by young children. Ex. 2(n) ("Umpiring is not for the faint of heart, it takes a special kind of patience when dealing with kids, coaches and parents."). As part of his umpire training, Mr. Stavig has taken de-escalation and conflict resolution classes. These have proven valuable in all facets of his life, helping him purge the reactivity and hypervigilance fostered by violent prison environments. Instead of matching anger with anger, Mr. Stavig has demonstrated an ability to keep his composure and calmly resolve conflict, crucial skills for a life outside prison walls.

5. <u>The Oregon Reentry Program</u>

Mr. Stavig is working to build the Oregon Reentry Program ("ORP") with its founder, Joel Foran. Ex. 2(c). ORP aims to help people leaving state prison integrate back into their

communities by finding housing, obtaining state identification and assisting with case management services. *Id.* Unlike the federal system, Oregon offers little reentry assistance to people leaving state prison. *See e.g.,* Exs. 2(a), 2(i).

The concrete steps he and his partner have undertaken to get ORP off the ground illustrate goal-setting behavior and a future-oriented approach consistent with successful rehabilitation. They have registered ORP with the Oregon Secretary of State, and, in June 2026, obtained tax-exempt status as a public charity under 26 U.S.C. § 501(c)(3). Ex. 6. They have submitted budgets for grant funding, networked with community partners and identified additional funding sources. *Id.* These efforts reveal something important about where Mr. Stavig's attention now goes, not just to keeping himself out of trouble but to helping others do the same.

**B. In light of his verifiable track record, Mr. Stavig's criminal history overstates his likelihood of reoffending.**

Mr. Stavig's criminal history category overrepresents his risk of reoffending and warrants a variance. It is the primary driver of his guideline range. If he were in Criminal History Category I, the low end of his range would be 18 months. In Criminal History Category V, his low end is 37 months, more than twice as long. According to the Sentencing Commission, one of the purposes of such enhanced sentences is to protect the public, as "[r]epeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." USSG ch. 4, pt. A, intro. cmt. That is only a statistical prediction, which Mr. Stavig proved does not apply to him.

There are two pending Clackamas County records that warrant acknowledgment. The first is the probation-violation proceeding in Clackamas County Case Number 21CR48205. That case arose from the same discovery of firearms that gave rise to this federal prosecution. It is not new or separate misconduct. The probation officer in that proceeding is the same officer who

now supports a community-based resolution. Ex. 2(a). The second case (24CR25775) involves charges of identity theft alleged to have occurred in August 2023, more than one year before Mr. Stavig's arrest here and squarely within the period of drug use that preceded his turnaround. PSR ¶ 66.[13] Both matters are artifacts of the life that Mr. Stavig has left behind.

**C. Nature and Circumstances of the Offense**

Mr. Stavig pleaded guilty to possessing six firearms, five of which had been reported stolen. PSR ¶ ¶ 18–19. One, a handgun, was found partially under the nightstand in his bedroom. PSR ¶ 18. Mr. Stavig obtained the gun for self-defense. In the early morning hours of October 8, 2023, a man named Devin Rose, who had just shot and killed a man in Gresham, left a garbage bag containing the murder weapon, bleach, and the clothes he was wearing on Mr. Stavig's porch. Ex 7. Mr. Stavig and Ms. Hemenway called 911. Police recovered the gun and forensically matched it to the shooting. *Id.* On October 19, 2023, Ms. Hemenway testified before the grand jury that indicted Mr. Rose for murder. *Id.* [14] Fearful of retribution, Mr. Stavig kept a handgun for protection. The other firearms were found in his garage, where Mr. Stavig allowed former associates to store them. PSR ¶ 19. There is no evidence that Mr. Stavig ever took the firearms out of his house, nor any evidence that he ever brandished, used, or threatened to use them.

What is notable about the offense is the context in which it arose, and what it shows about Mr. Stavig's struggle to reacclimate after prison. At the time, he had been out of custody for less than five years, after serving more than a nine-year term. Mr. Stavig was in a healthy,

---

[13] The date of arrest states "08/05/2023" but the description of the offense states the conduct occurred between August 3, 2025, and August 5, 2025. Given the context, that is a scrivener's error. The alleged conduct occurred in 2023.

[14] Mr. Rose was convicted of murder in the second degree and is currently serving a life sentence in the Oregon Department of Corrections.

supportive relationship and was close with Izzy. He was working. But he still lived in his old community, and he struggled to rid himself of the hypervigilance and hyper defensiveness that are hallmarks of institutionalization.[15] Although five years post-prison may seem like sufficient time to reintegrate into society, studies show that, consistent with Mr. Stavig's journey, the psychological effects of institutionalization are long-lasting and reintegration is not linear.[16] Mr. Stavig's possession of a handgun speaks to that hypervigilant perception of threat. Of course, none of this excuses his conduct. Mr. Stavig knew he could not possess a firearm under any circumstances, and he ultimately accepted responsibility for doing so. But it does explain his behavior. It was that of a man still straddling two worlds. Within weeks, he would leave the old one behind.

**D. A sentence of probation satisfies the need for the sentence imposed to provide just punishment, afford adequate deterrence, protect the public, and provide Mr. Stavig with needed treatment in the most effective manner (§3553(a)(2)).**

This is not just a case about whether Mr. Stavig deserves credit for what he has done. It is a case about whether prison would undo those things that made Mr. Stavig and his community safer. The likelihood that Mr. Stavig will commit another crime is very low, despite his criminal history. Nearly two years of monitoring under two jurisdictions, random drug and alcohol testing, search conditions and more—with no violations—is a real-world public safety record, not a prediction.

---

[15] "[S]pending nearly a decade in state prison forces the brain into a state of chronic, hypervigilant fight-or-flight. Prison environments necessitate survival-driven, hyper-defensive, and often animalistic behaviors simply to endure day-to-day existence." Ex. 2(i).

[16] Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* 18 (Dec. 2001) (paper prepared for "From Prison to Home" conference, U.S. Dep't of Health & Hum. Servs. & Urban Inst., Jan. 30–31, 2002) (explaining that the stigma of incarceration and the psychological residue of institutionalization require active and prolonged agency intervention to transcend), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/psychological-impact-incarceration-implications-post-prison.

As described above, Mr. Stavig has done everything he can to transform himself. He built strong family and community ties, which are among the strongest protections against a return to crime.[17] He is committed to his sobriety, which matters a great deal for someone whose crimes were driven by addiction. *See United States v. Perella*, 273 F. Supp. 2d 162, 164 (D. Mass. 2003) ("If drug addiction creates a propensity to crime, drug rehabilitation goes a long way to preventing recidivism. In fact, statistics suggest that the rate of recidivism is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting."). He is dedicated to helping kids succeed in sports and is working to build ORP—the kind of generative, give-back commitment that research associates with lasting desistance from crime.[18]. The people who know him best, including two professionals in the criminal justice system, attest that the transformation is real. Exs. 2(a) and 2(i).

A prison sentence, by contrast, would make Mr. Stavig more likely to reoffend.[19] Research has shown that even relatively short periods of confinement can reshape a person's psychology in ways that make the transition back to ordinary life difficult.[20] The harm accrues quickly. Researchers have found higher levels of anxiety in inmates after eight weeks in jail than after one week in jail, as well as increases in psychopathological symptoms after just 72 hours of confinement.[21] And "the longer someone remains in an institution, the greater the likelihood that the process will transform them."[22]

---

[17] *See* Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Compar. Criminology 95, 99–100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures.").
[18] *See* Maruna, *supra*.
[19] "Sending Ray to prison would re-expose him to an environment that fosters hypervigilance and survival behaviors, inflicting a devastating setback on the progress he has worked so hard to achieve while depriving our community of an impactful mentor and leader." Ex. 2(i).
[20] *See* Haney, *supra* note 14, at 5–11.
[21] *Id.* at 5 n.7 (summarizing findings reported in Bonta & Gendreau).
[22] *Id.* at 7.

The research also explains why the specific gains that Mr. Stavig made are particularly vulnerable to disruption by incarceration. On employment: "[g]ainful employment is perhaps the most critical aspect of post-prison adjustment. The stigma of incarceration and the psychological residue of institutionalization require active and prolonged agency intervention to transcend."[23] Mr. Stavig has already solved this problem himself, without an agency's help, by building Dr. Chimney into a successful business. Imprisoning him risks undoing that solved problem. On family: incarceration disrupts the capacities, such as trust, availability and consistency, that parenting and partnership require. Prison can also leave a returning parent with "problems being psychologically available and nurturant" even after release.[24]

Prison further threatens Mr. Stavig's sobriety. Drugs are readily available inside prison walls, and he would not be subject to regular (albeit random) drug screening.[25] Furthermore, prison would cut off Mr. Stavig's access to the most effective mental health treatment for supporting his rehabilitation. *See, e.g., United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009) (affirming a downward variance from a 41-to-51-month guideline range to five years of probation based, in part, on a conclusion that incarceration would undermine the defendant's rehabilitation); *United States v. Olhovsky*, 562 F.3d 530, 542 (3d Cir. 2009) (vacating sentence where the district court failed to adequately consider the defendant's need for ongoing mental health treatment). The mental health treatment that Mr. Stavig is receiving for his PTSD is more effective and more tailored to his needs than anything available in prison. He also has significant

---

[23] *Id.* at 18.
[24] *Id.* at 15.
[25] Inside the Nation's Overdose Crisis in Prisons and Jails, The Marshall Project (July 15, 2021), https://www.themarshallproject.org/2021/07/15/inside-the-nation-s-overdose-crisis-in-prisons-and-jails; Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts, Office of the Inspector General U.S. Dept. of Justice, (June 29, 2016), https://oig.justice.gov/sites/default/files/reports/e1605.pdf

ongoing medical needs: the after-effects of severe head trauma and brain bleed, a seizure disorder, and a pending neurology appointment. Exs 4-5.

These are not abstract concerns for Mr. Stavig. He has been incarcerated repeatedly since he was a teenager, including, most recently, a nine-year term that he completed in 2019. No prior term of incarceration changed his trajectory the way the last two years of voluntary, community-based treatment have. Imposing another term of incarceration risks proving the same point all over again, except this time it would be at the cost of a family, a business, and a community of children who have come to depend on him.

### E. Probation is an available sentence for Mr. Stavig

Mr. Stavig is eligible for probation, and such a sentence is appropriate here. The applicable guideline range addresses the heartland of § 922(g) cases, but Mr. Stavig is an outlier. Under the Guidelines, Mr. Stavig can never escape his criminal history, no matter the effort he makes. The Guidelines rest on data showing that most people with his record present an ongoing risk to society and therefore should be imprisoned longer. But Mr. Stavig is not most people. He has proven that he is not a danger to the community.

Mr. Stavig does not object to the special conditions the presentence report recommends, nor to a period of home detention as the Court deems appropriate to reinforce the seriousness of this offense. Such a sentence holds Mr. Stavig accountable, protects the public through continued, real-time supervision, and allows him to continue the treatment, employment, and building the family and community relationships that have already made him and the public safe. Because a sentence of probation must include a fine, restitution, or community service, Mr. Stavig proposes a condition of at least 500 hours of community service, which could be

performed through youth sports or ORP, or as an alumni mentor with his drug treatment program.

## V. The Need to Avoid Unwarranted Sentencing Disparities

The Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It must likewise avoid unwarranted similarities among defendants who are different in ways the Guidelines do not account for. *See Gall*, 552 U.S. at 55 (approving the district court's consideration of the "need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

The PSR reports that, over the past five years, nearly all defendants sentenced under USSG § 2K2.1 with an offense level of 15 and a criminal history category of V received prison terms, averaging about 40 months. PSR ¶ 104. Those figures say nothing about how those defendants spent their time between arrest and sentencing — a factor the Guidelines do not account for. To treat Mr. Stavig like every other defendant with the same offense level and criminal history category creates an unwarranted disparity. It would treat a person who is putting forth an extraordinary effort at rehabilitation the same as someone who did nothing while his or her case was pending, or someone who failed drug tests or violated other conditions of his or her release. Section 3553(a)(6) forbids such a result.

## VI. Conclusion

Two years ago, Mr. Stavig was a man still straddling two worlds. The government would have been justified in sending him to prison then. Instead, he was given a chance, and he seized it. He got sober and stayed sober. He sought out treatment and therapy that no one required of him. He left his old neighborhood and his old friends. He married, became a father, and rebuilt

his relationship with the parents who never gave up on him. He built a business that supports his family. And he has given his time, week after week, to the children of his community and to people coming home from prison who face the same odds he once did.

The guidelines range reflects what Mr. Stavig did. The § 3553(a) factors require that the Court sentence who he is today. A sentence of imprisonment will not make the community safer. It will dismantle the structures that have enabled Mr. Stavig to pursue a law-abiding life. It will sacrifice rehabilitation for the sake of retribution. Mr. Stavig cannot change his past. But he has changed everything else that he can. For these reasons, Mr. Stavig respectfully asks the Court to impose a sentence of five years' probation, with a term of home confinement, the conditions recommended by probation and the community service condition proposed above.

//

Respectfully submitted on October 12, 2026

*/s Katie Marchant*
Katie Marchant, OSB 161147
Attorney for Raymond Allen Stavig